BEVERLY TOOLEY, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Buske Van Lines, Inc., Appellee).

Fifth District (Industrial Commission Division)   No. 5—91—0883WC

Opinion filed November 6, 1992.—Rehearing denied December 4, 1992.

Peter C. Drummond, of Staunton, for appellant.

R. Kent Schultz, of Holtkamp, Liese, Beckemeier & Childress, P.C., of St. Louis, Missouri, for appellee.

JUSTICE H. LEWIS delivered the opinion of the court:

The claimant, Beverly Tooley, appeals the judgment of the circuit court confirming the decision of the Industrial Commission of Illinois (hereafter referred to as the Commission). The Commission affirmed and adopted the decision of the arbitrator, who found that the claimant failed to prove the existence of an employment relationship between herself and the respondent, Buske Van Lines. Upon review the claimant articulates four issues: (1) whether the Commission applied an improper standard to determine if claimant was respondent's employee; (2) whether the finding of the arbitrator that claimant did not receive any compensation from the respondent is incorrect as a matter of law; (3) whether the evidence does indicate that claimant received compensation; and (4) whether the Commission's finding that the testimony of the respondent's witness, Charles Estes, was credible is against the manifest weight of the evidence. We affirm.

■ Section 1(b)(2) of the Workers' Compensation Act (Ill. Rev. Stat. 1987, ch. 48, par. 138.1(b)(2)) (hereafter referred to as the Act) defines an "employee" as "[e]very person in the service of another under any contract of hire, express or implied, oral or written." The underlying purpose of workers' compensation legislation in Illinois and in other States is to provide financial protection in various forms, including the restoration of lost wages, to workers whose earning power is interrupted or terminated as a consequence of injuries arising out of and in the course of their employment. (*Board of Education v. Industrial Comm'n* (1972), 53 Ill. 2d 167, 290 N.E.2d 247.) Consistent with the philosophy of the legislation, which assumes that a worker is gainfully employed at the time of his injury, it is generally recognized that a true employer-employee relationship does not exist in the absence of the payment or expected payment of consideration in some form by employer to employee. (*Board of Education*, 53 Ill. 2d 167, 290 N.E.2d 247.) As a consequence, the workers' compensation statutes throughout this country have uniformly been construed to exclude from coverage purely gratuitous workers who neither receive, nor expect to receive, pay or other remuneration for their services. *Board of Education*, 53 Ill. 2d 167, 290 N.E.2d 247.

■ Further, the relationship of an employer and an employee is a product of mutual assent. (*Board of Education*, 53 Ill. 2d 167, 290 N.E.2d 247; *Wolverine Insurance Co. v. Jockish* (1980), 83 Ill. App. 3d 411, 403 N.E.2d 1290.) Although the definition of "employee" contained in the Act is to be broadly construed, there can be no employer-employee relationship and there can be no liability for workers' compensation under the Act in the absence of a contract of hire, express or implied. (*Crepps v. Industrial Comm'n* (1949), 402 Ill. 606, 85 N.E.2d 5.) The relationship of employer and employee is a contractual relationship, the requisites to the formation of which are determined by an application of the principles governing the formation of other contracts. (*Crepps*, 402 Ill. 606, 85 N.E.2d 5.) The relationship is a product of a meeting of minds expressed by some offer on the part of one to employ or to work for the other and an acceptance on the part of the other. *Crepps*, 402 Ill. 606, 85 N.E.2d 5.

■ In compensation proceedings, the existence of an employer-employee relationship is primarily a question of fact and can become a question of law only where there is no conflict in the evidence and but one conclusion can reasonably be drawn therefrom. (*Crepps*, 402 Ill. 606, 85 N.E.2d 5.) The Commission exercises original, rather than appellate, jurisdiction in reviewing decisions of the arbitrator. (*Paganelis v. Industrial Comm'n* (1989), 132 Ill. 2d 468, 548 N.E.2d 1033.) Thus, it is within the province of the Commission to judge the credibility of witnesses, to draw reasonable inferences from their testimony, and to determine what weight the testimony is to be given. (*Paganelis*, 132 Ill. 2d 468, 548 N.E.2d 1033.) Accordingly, the decision of the Commission on a question of fact will not be disturbed unless it is contrary to the manifest weight of the evidence. *Paganelis*, 132 Ill. 2d 468, 548 N.E.2d 1033.

In the instant case the arbitrator found, and the Commission adopted his findings, that "in this case there is absent the mutual assent necessary in order to form an employment relationship" and that the claimant "failed to establish the existence of payment or expected payment of consideration in some form or another by the Respondent to the [claimant]." The arbitrator stated further, "The issue is whether there was any payment or expected payment by the Respondent to the [claimant]. Having previously found that there was no such payment or expected payment, the Arbitrator finds no employment."

Upon judicial review the circuit court expressly stated that the finding of the arbitrator that an employer-employee relationship did not exist between the claimant and the respondent is not contrary to

the manifest weight of the evidence. The circuit court concluded: "The record supports the findings that there was no mutual assent for a contract of employment. What was done by the parties was to arrange for claimant 'to accompany her newly married husband' on his trucking jobs."

At the hearing conducted before the arbitrator on August 14, 1989, the claimant testified that as she and her husband were unloading boxes of potato chips on May 8, 1987, she was injured when two boxes weighing about 20 to 30 pounds struck her in the back; she heard a pop and after about five minutes experienced severe pain in her back. The claimant stated that in March of 1987 the respondent had employed her husband as a driver, that her husband had "inquired as to the possibility of [her] being a trainee to be a co-driver with him," and that she had talked to the respondent's employee Chuck Estes about the possibility. She had, she said, told Chuck Estes that she would like to drive with her husband and to help him drive. She stated further, "he told me that if I met all the qualifications, I could start as a trainee until I could pass all tests and everything, and then I could get my license and I could drive if I passed all the qualifications." She obtained a Class D instruction permit issued by the Illinois Secretary of State allowing her to drive a truck as long as someone was beside her. She said she was not allowed to drive a truck by herself until she obtained a Class D license. At the time she was injured, she had not taken the final examination, that is, the "driving part," to obtain a Class D license and has never taken that examination.

Claimant submitted a completed application to the respondent and passed a physical examination. From Chuck Estes she received "authorization cards, so that I was able to be on the truck with my husband as a trainee." She said that Chuck Estes had had her watch a video tape concerning the keeping of logs and "green sheets" and dealing with emergencies. "And after I watched that," she said, "he told me to be sure and study up on everything so I'd know how to fill out paperwork, and that I could drive as long as my husband was sitting beside me, after I learned everything, but he said I would learn as I was on the truck. So after that, he told me that he would call us when we had a run and I could begin my training." Thereafter she began to accompany her husband in the truck, learning on the truck to fill out a log and "green sheets." Truck drivers, she said, are paid "so much a haul," which was, she thought, 19 cents per mile. She testified that checks were issued to her husband but not to her and that although Chuck Estes had told her she would be paid for unloading,

she never was, despite having unloaded five or six times during the time she accompanied her husband. She testified that she had been promised employment by Chuck Estes in the event she obtained a Class D license. She indicated that she had understood that before she could become an employee of the respondent she had to pass a separate driving test to be given by the respondent, which had never been administered.

Charles Estes testified for the respondent that at the time in question he worked as its safety director and that he "took care of the driver qualification files." He stated that claimant's husband had indicated to him "[t]hat he had recently been married, that he had lost his job on the railroad, that he was going to be forced into driving truck[s] for a living, but he would like to be able to take his wife with him, since they were recently married." The witness indicated that he had met with claimant and her husband on about April 3, 1987, concerning her riding with her husband on the truck. The witness told her that in order to ride with her husband she would need to do certain things, including filling out an "application" and taking the test from the State of Illinois to obtain a Class D permit. The witness testified: "To my knowledge, she never asked me for a job. She asked to go in the truck with her husband." Asked to explain the difference between requesting a job and requesting to drive with her husband, the witness answered:

> "Well, if she would have applied for a job, she would have been an employee and expected to drive at least 50 percent of the time. Since she didn't have the license to do so, then she could merely be a rider, not a driver; or not an employee, I should say."

He had, he said, given her an employment application in order to be in compliance with the requirements of the Department of Transportation. Without a completed application, he explained, "she could not legally drive the vehicle." Asked whether the claimant had at any time indicated that she wanted to be an employee of the respondent, the witness responded: "The only time that [claimant] indicated that to me was when she wanted all [her husband's] wages put in her payroll name and her to be paid. And I told her she couldn't have that because she was not an employee." This conversation occurred after she had begun riding with her husband. Thereafter she continued to drive with her husband and did not indicate to the witness that she wanted to become an employee.

The witness indicated that all drivers are limited by the Department of Transportation to driving and working only a certain number

of hours and that whenever the claimant drove the truck, pursuant to her "instruction permit," the number of hours that she drove was subtracted from the number of hours her husband was permitted to drive. This was so because her husband had to be awake while she was driving. A driver is not permitted to drive over 70 hours per week. Before the claimant could have become a driver, she would have had to have a Class D license from the State of Illinois to operate a commercial vehicle and to have taken a road test with the witness in the vehicle "to determine if her skills were good enough to turn loose with a vehicle." He described the road test by the respondent as being mandated by the Department of Transportation. At no time did the claimant satisfy either of these two requirements.

When asked what would have happened in terms of claimant's obtaining employment with the respondent if she had passed its road test and the State's test for a Class D license, the witness responded: "She would still have had to be a co-driver with her husband after the issuance of the D license and the road test, due to lack of experience. I mean, she could not drive a vehicle by herself." She would, he said, have been paid as a co-driver with her husband if she had passed those two tests. The witness had told the claimant that if she met all qualifications, including the two that were unfulfilled, she "could" be employed but not that she "would" be. Employment would not have been "automatic" because clearance from the respondent's insurer would have been necessary. The witness testified that he had never promised claimant employment with the respondent, compensation or payment for driving with her husband, or payment for assisting her husband in loading or unloading. The witness said that prior to the accident on May 8, 1987, he had had no knowledge that claimant had been assisting her husband in the loading or unloading of the trailer. Asked why the claimant was referred to as a "driver-trainee" if all she wanted to do was to ride with her husband, the witness explained: "[A]nyone who wanted to go with her husband was classified as a driver-trainee. This was not an unusual file. There were a few more." A fully qualified co-driver would be able to drive 70 hours a week, as would the other driver in the truck for a total of 140 driving hours. Two fully qualified drivers could earn more money than a single qualified driver because they could drive more miles.

■ The record itself shows that the Commission did not apply an improper standard to determine whether the claimant was an employee of the respondent. The Commission plainly resolved questions of credibility, which are within its province to determine, in favor of Charles Estes. The finding of the Commission that there was no pay-

1060

ment or expected payment by the respondent to the claimant is not against the manifest weight of the evidence. Similarly, the finding of the Commission in favor of the respondent concerning the factual question of whether an employment relationship existed between claimant and respondent is not against the manifest weight of the evidence. Although the possibility of future employment may have been contemplated by the parties, the claimant has not shown the existence of an employer-employee relationship at the time of her injury. Accordingly, we may not disturb the decision of the Commission, and the judgment of the circuit court confirming the Commission's decision is affirmed.

Affirmed.

McCULLOUGH, P.J., and WOODWARD, STOUDER, and RAKOWSKI, JJ., concur.